(May 15, 1893.)

## HAWKINS v. SPOKANE HYDRAULIC MINING CO.
### [33 Pac. 40.]

MINES AND MINING—MAJORITY INTEREST CAN MANAGE AND CONTROL MINE.—Under the statutes of Idaho the party or parties owning a majority interest in a mining claim or mine, in the absence of any specific agreement to the contrary, have the right to the control and management of the same, subject to the laws of the United States and of this state.

MINORITY MINGLING GOLD FROM ANOTHER CLAIM CANNOT RECOVER.—Where a mining corporation works a mining claim in which it has a minority interest, against the protest of the majority interest, and mingles with the gold extracted therefrom a portion of gold from its own claim, without the consent of the other party, and the quantity and value of such portion is unknown, the minority interest cannot recover the gold so mingled.

(Syllabus by the court.)

APPEAL from District Court, Shoshone County.

Woods & Heyburn, for Appellant.

The Revised Statutes of Idaho, chapter 2, of title 11, prescribes the relations existing between persons owning mining

property, and operating the same.  Section 3300 provides that a mining partnership exists when two or more persons who own or acquire a mining claim for the purpose of working it and extracting the mineral therefrom actually engage in working the same.  Section 3301 prescribes that an express agreement to become partners or to share the profits and losses of mining is not necessary to the formation or existence of a mining partnership.  The relation arises from the ownership of shares or interests in the mine and working the same for the purpose of extracting the mineral therefrom.  Section 3304 says: The mining ground owned and worked by partners in mining, whether purchased with partnership funds or not, is partnership property.  Section 3309 says: The decision of the members owning a majority of the shares or interests in a mining partnership binds it in the conduct of its business.  The plaintiff, owning seven-eighths of the property in question, was entitled to dictate the manner of mining and operating the same. (*Dougherty v. Creary,* 30 Cal. 300, 89 Am. Dec. 116.)  The doctrine governing mining partnerships, aside from the statutes of Idaho, is clearly laid down in the case of *Duryea v. Burt,* 28 Cal. 577.

Charles W. O'Neil and Frank Ganahl, for Respondent.

Ownership and working by the parties coinciding the relationship of partnership is the result.  Section 3309 is still stronger: "The decision of the members owning a majority of the shares or interests in a mining partnership binds it in the conduct of its business," i. e., the partnership being shown to exist from the ownership and the working together, the control is vested in those who own a majority of the interests.  The right of control is given to the majority interest only in the event of a partnership.  The partnership is dependent upon the factors of working and ownership.  The partnership existing, the control is invested in the majority interest, but the majority interest cannot control unless the relation of the partnership exists.  Hence the assumption by the appellants, that the plaintiff owning seven-eighths of the property in question was entitled to dictate the manner and means of mining and operating the same and entitled to prohibit the minority owner from working at all, is a fallacy.  Plaintiff is not invoking the power

of his seven-eighths interest in the partnership for the purpose of carrying on the business of mining, but is invoking it for the purpose of preventing mining being carried on and the gold in the claim extracted; and even if the relation of partners existed between himself and the defendant, he could not invoke the principle here laid down, for the very reason that the object of this suit is to procure a temporary, and afterward permanent, injunction of the mining of the claim at all. In other words, the owner of seven-eighths as a tenant in common says to the owner of one-eighth, "I own the control in this ground, and I forbid you from mining it." To the same effect as the above is *Settembre v. Putnam,* 30 Cal. 490.) (*Skillman v. Lachman,* 23 Cal. 199, 83 Am. Dec. 96, and note.) Whatever may be the rights and liabilities of tenants in common of a mine not being worked, it is clear that where several owners unite and co-operate in working the mine, then a new relation exists between them, and to a certain extent they are governed by the rules relating to partnership. They form what is termed a mining partnership." (*Henderson v. Allen,* 23 Cal. 519; *Bradbury v. Barnes,* 19 Cal. 120; *Duryea v. Burt,* 28 Cal. 569; *Dougherty v. Creary,* 30 Cal. 300, 89 Am. Dec. 116; *McConnell v. Denver,* 35 Cal. 369, 95 Am. Dec. 107; *Nolan v. Lovelock,* 1 Mont. 227; *Decker v. Howell,* 42 Cal. 642.)

MORGAN, J.—This case was before this court on appeal from an order refusing an injunction, and is reported in *Hawkins v. Spokane etc. Min. Co.,* ante, p. 241, 28 Pac. 433. The facts are sufficiently stated in that opinion, and it is unnecessary here to repeat them. It was there decided that the plaintiff, owning seven-eights interest in the mining property, was entitled to control the means used and the method adopted in working the mine, and the cause was remanded, with direction to the court below to grant the injunction to restrain the defendant from working said mine, except in the manner directed by plaintiff, to compel the defendant to pay all the proceeds of the work done by the defendant into court, and compel an accounting by the defendant. In accordance with the above direction, the case was again called before the district court of Shoshone county. An injunction issued, enjoining said company from working said mine. The

defendant was compelled to pay the proceeds of the work already done into court, which then proceeded to take the required action, distributed the proceeds, and rendered final judgment therein. From the said judgment apportioning the said proceeds of the mine an appeal is taken to this court.

Upon said accounting the defendant put in the following account, which was allowed by the court, as appears by finding No. 4, to wit: Placer gold washed and extracted by defendant from the Niagara mine, together with a small quantity taken from the "Hatched Area" in the Rosa claim, which said Rosa claim was owned by the defendant, $10,504.86. The court also finds that the amount of gold found in said "Hatched Area," and belonging exclusively to the defendant, was $583.60. · This amount the court deducts from the total sum, leaving the sum of $9,921.26 as being the amount taken from the Niagara claim, The court finds that the total amount necessarily expended by the defendant for working the said claim and the "Hatched Area" for labor, material, and supplies furnished, exclusive of any charge for water, is $5,855.93. That the defendant used and furnished divers tools, pipes, two giants, sundry lines of flume, etc., the exclusive property of defendant 111 days, the reasonable value of the use of which was $550. That the fair proportion of all the expenses chargeable to the said "Hatched Area" on the Rosa claim is the sum of $356.16, being one-eighteenth thereof, leaving the total amount necessarily expended in working the Niagara claim $6,050.77. That about $1,200 thereof was expended in preparing ground on the Niagara claim for future work, and is allowed; and the defendant is allowed for the use of the water for washing said Niagara claim the sum of $2,480.31, being a sum equal to one-fourth of the total ·sum of gold taken from the Niagara claim. The total amount allowed to the defendant is the sum of $8,535.08. The balance to be divided between the plaintiff and the defendant is the sum of $1,386.18, as the profit made in working said Niagara claim, of which the plaintiff is to receive seven-eighths, to wit, $1,212.91, and the defendant is entitled to receive $173.27. Judgment was entered in this cause in accordance with this finding, to all of which findings, and to the judgment, the plaintiff then and there excepted, and brings the case by appeal to this court.

To get an idea of the condition of this property before and at the time the work that is complained of was done, we quote from the testimony of Mr. Coulter, who, in the year 1889, owned the one-eighth interest in the Niagara claim, which he, before the commencement of this work, transferred to the defendant, and Coulter was also a large owner in the water right and machinery of the defendant, and the manager of the corporation, when this work was done on the Niagara claim in the year 1891. It relates a conversation between the plaintiff and said Coulter before the commencement of this work. Coulter says: "I called him [Hawkins] into the office for the purpose of determining whether or not it was possible to make an agreement, under any conditions; and his demands were so outrageous, according to my notions, that it was impossible for us to agree, and I called his attention to the fact that the last time we worked the ground together, and on the day of the final clean-up, which was made in 1889, that we both agreed that under the present system the ground could not be worked at all and pay expenses, and that he asked me to go to Mr. Mills, and submit a proposition for the sale of the property. I asked him if he remembered the proposition he asked me to submit to Mr. Mills, and he said he did, but he said, 'The conditions have changed, and I propose to take advantage of them.' And I says, 'You don't propose to work the ground?' and he says, 'No.' 'Well,' I says, 'I do.' He says, 'I will stop you.' I told him that it was not in the books," etc. This testimony of Coulter's, it seems to me, is the key to the whole situation. Prior and up to 1889 Coulter was the owner of one-eighth of the Niagara claims, and Hawkins was the owner of seven-eighths of said claims. They had worked the claims together, and it was the opinion of both that under the then conditions the claims could not be worked at such a profit as warranted, or, at least induced, continuance of the work. Coulter then proceeded to change the conditions, at least so far as he was concerned. He sells his one-eighth interest to the defendant corporation, in which he is an owner, and then proposes to work out the claim for what the water will bring; the seven-eighths interest of plaintiff being simply appropriated to pay water rates, in which he, plaintiff, had no interest whatever. This would be wholly inequitable. If we were to sus-

tain such a proposition, we would simply be recognizing practical confiscation. It is shown by the evidence of Coulter, the representative, and a large owner in the defendant corporation, that up to and including the year 1889, he and the plaintiff had worked the claims together. Is not this a little inconsistent with the contention of the defendant, so strenuously insisted upon, that no mining partnership existed, because the plaintiff and defendant had never worked the claim together? Could the man Coulter change the status of the parties under the statute by a sale of his interest to the corporation in which he was a principal owner? Could he enlarge his rights, or diminish those of the plaintiff, by such a transfer? We think not.

The plaintiff offered in evidence a letter from Coulter, in which Coulter states, after giving the facts upon which his conclusions are based, that it is "a matter of serious doubt whether it [the Niagara claim] will pay all the way through or not"; and he adds: "It is my intention to try and get out of it before another season, and am now on the sell," etc. The introduction of this letter was objected to by defendant, and the objection was sustained by the court, which ruling, we think, was error. Having concluded that there was no profit for him in working the claim for one-eighth interest of the gold that was in it, he proposes to utilize the entire gold product of the claim, by working it with water and expensive appliances, all belonging to defendant corporation, as is seen by the account presented and allowed by the court.

The respondent cites the following cases:

*Duryea v. Burt,* 28 Cal. 569 : In this case the court announced the principles enacted in our statute and in the California statute as well. Both that and *Dougherty v. Creary,* 30 Cal. 290, 89 Am. Dec. 116, are leading cases, and were cited and closely followed in the opinion in this case in ante, p. 241, 28 Pac. 433.

*Decker v. Howell,* 42 Cal. 636, announces no new principle, and none different from that given as the law in this case. In addition, the court stated that the mine owners might form a strict commercial partnership, if they so desired, and in that case one partner might give a note which would be binding on the other partner.

In *Settembre v. Putnam,* 30 Cal. 490, it is decided that where one partner of a mining partnership is sent as the agent of all, to purchase or lease the land on which the mine is situated, and he does so, but takes the deed in his own name, the property belongs to the partnership, which principle, old as the law of resulting trusts, the California legislature, followed by our own, has made an awkward attempt to enact in section 2515 of the Civil Code of California, and section 3304 of the Revised Statutes of Idaho. The court, in this opinion, also states that the plaintiff, by reason of the agreement between him and the defendants, making him a mining partner, as between him and them, is entitled to a corresponding share of the profits of the mine, and this necessarily entitles him to an account.

*Taylor v. Castle,* 42 Cal. 367: In this case the defendant Castle purchased the interest, being a one-sixteenth, of P. H. Ford, one of the original partners of the New York Hill Mining Company, and afterward sold one-half of such sixteenth to the defendant Seligman. Neither Castle nor Seligman, however, attended the meetings of the partnership, and there was nothing to show that they ever approved or consented to the contract of the company with the plaintiff, who had built a mill for the company. The court say: "It is well established now that in such partnerships there is no *delectus personae.* The partnership is not dissolved by the death of a partner, nor as a consequence of a sale of an interest to a stranger. As, therefore, the sale of an interest to Seligman did not dissolve the partnership, I think by his purchase he presumptively became a partner, although he took no part in the management of the partnership affairs, and never held himself out to the world as a partner." It will be seen by this decision that Seligman became a partner by reason of his ownership of shares, and was liable for the debts, although he never assisted in working the mine, or in the management of its affairs, nor held himself out as a partner. In this, it, the mining partnership, is seen to be precisely like a corporation. In short, a mining partnership, by virtue of our statute, in all its essential elements is precisely like a corporation. To make this fact perfectly apparent, let us paraphrase our statute. Let us suppose a corporation owning a woolen factory, and regularly organized. Compare the principles announced with our mining

partnership. We have substituted the word "corporation" for "mining partnership," and the words "corporate property" for "mine." A corporation owns a woolen factory. No express agreement to share in profits and losses is necessary. The right to share in profits and losses arises from the ownership of shares or interests in the factory, and running the same. (Rev. Stats., sec. 3301.) A member of the corporation owning a factory shares in the profits and losses thereof in the proportion which the interests or shares he owns in the corporation bear to the whole corporate capital or whole number of shares. (Rev. Stats., sec. 3302.) Each member of the corporation has a lien upon the corporate property for money advanced by him for its use, and a lien exists upon the corporate property in favor of the creditors of the corporation, notwithstanding an agreement among owners that it must not. (That is, the creditors may levy upon and sell all the corporate property for the payment of debts.) (Rev. Stats., sec. 3303.) Section 3304 is a meaningless jumble, and is therefore omitted. One of the owners of corporate property (that is, a stockholder) may convey his interest (stock) in the corporate property and business without dissolving the corporation. The purchaser, from the date of his purchase, becomes a member of the corporation. (Rev. Stats., sec. 3305.) A purchaser of an interest in corporate property takes it subject to the liens existing for debts due all creditors thereof, or advances made for the benefit of the corporate property or business. (Rev. Stats., sec. 3306.) A purchaser of the interest of a stockholder takes with notice of all liens resulting from the relation of the stockholders to each other and to the creditors of the corporation. (Rev. Stats., sec. 3307.) (This section, it will be seen, renders the exception in section 3306 nugatory; therefore it is omitted.) No member of a corporation (i. e., stockholder) or agent or manager thereof can, by a contract in writing, bind the corporation, except by express authority derived from the stockholders thereof. (Rev. Stats., sec. 3308.) The decision of the members owning a majority of the shares or interests in a corporation binds it in the conduct of its business. (Rev. Stats., sec. 3309.) This is a perfectly fair exposition of the mining law as it stands in our statute. The owners are tenants

in common only so far as the possible right to a common pos-
session. This common possession is of no practical benefit to
the minority owner, except to give him the right to complete
inspection and examination, so far as may be necessary, to as-
certain the value of the property, and the methods in use for
working the same, if it is being worked; in short, so far as
may be necessary for the complete protection of his interest,
and to enable him to dispose of his interest, if he so desires,
and of working the mine, if not forbidden or prevented by the
majority interest. We are not, however, attempting to say just
how many and what rights the minority interest has, as it is
not necessary or proper in this decision. We are perfectly
aware that the courts have hesitated, in apparent trepidation,
to go to this extent, but the decisions, carried to their legiti-
mate result, end in absolute control of the working of the mine
or the nonworking thereof, subject, of course, to the laws of
the United States and of our own affecting such property.
Our own statutes relating to mining partnerships put this
power, in our opinion, beyond question. With the practica-
bility of these statutes, as applied to mining property, we have
nothing to do. We can see no harm therein, however. They
are the same principles that govern all corporations, to the ex-
tent of the control and management thereof. We can readily
see that much harm might result if the decisions of the courts
and the statutes had not so carefully guarded the interests of
mine owners. A corporation—as, for instance, the defendant
in this cause—owning large water rights and abundant ma-
chinery, upon the capital invested in which they very properly
desire to secure reasonable interest, would have only to buy,
say one-twentieth interest in each of the mining claims lying
contiguous thereto, and which could be worked with this water
and machinery, and then proceed to work out these claims
against the protest of the majority interest. It would not
matter to this corporation whether the mines paid the owners,
if only they took out enough to pay for the working and inter-
est on the money invested in the machinery and water. The
life, the substance, and the only value of the property might
thus be transferred to the water company, with no dividends
whatever accruing to the owners of the mines, and the latter

be without any remedy, whereas the same mines might be worked with less expensive appliances, or with new processes, continually being brought into use, and pay their owners well.

In view of these principles, as established by our law, it will be seen that the defendant had no right to proceed to work the Niagara claim against the protest of the majority interest. We therefore proceed to examine the testimony in the case at bar. Mr. Coulter testifies: "We used all the water there was in the pipes, from the time we commenced, on June 8th, until September 21st, on the claim, using 41,718 inches of water. I charged twenty-five cents an inch for water, which I thought was very reasonable." This would make the aggregate cost of water alone $10,428.50. Add to this Coulter's estimate of the cost of material and labor, to wit, twelve cents per yard for removing 48,883 cubic yards—$5,859.96—and we have the aggregate sum of $16,288.46 as the cost of producing $10,-504.86 of gold. It is conceded that Hawkins worked the ground at a profit in 1889. Again, Coulter testifies: "It cost him [Hawkins] thirty-nine cents per cubic yard for gravel moved, for labor and material alone. . . . . Including twenty-five cents per inch for our water, it cost us per cubic yard equal to what it cost him for labor and material alone, without accounting for any charge for water, i. e., about thirty-nine cents." This calculation would make the cost of the production of $10,504.86 of gold by defendant $19,064.37 —a net loss of $8,559.51. Again, Coulter testifies: "The gold is found either on bedrock or close to it. Ninety-eight per cent of it is within ten feet and possibly five feet, of bedrock." And again the same witness, in accounting for Hawkins getting fifty-eight cents per cubic yard, while defendant got but twenty-four cents per cubic yard, says: "He [Hawkins] was working in the grass roots, and there is as much gold in the light ground as there is in the ground that is one hundred feet deep." Hawkins testifies that the ground was not over forty-five or fifty feet at the highest point; less, rather than more. Taking into consideration the offer of plaintiff in his complaint, wherein he states that he is willing to pay seven-eighths of the actual cost of extracting the gold, perhaps it would be but fair to take his (plaintiff's) own estimate of what the actual cost of production should be. We find that plaintiff puts the actual cost of pro-

660    Hawkins *v.* Spokane etc. Min. Co.    [Sup. Ct.

Opinion of the Court—Morgan, J.

duction at sixteen and one-half cents per cubic yard, i. e., ten cents per yard for removing gravel and six and one-half cents per yard for water. Then taking the lowest estimate of area given by the surveyors, to wit, 34,000 cubic yards, and we have the cost of production $5,610. This from product, $10,504, leaves to be distributed $4,894.86, of which the plaintiff is entitled to seven-eighths and the defendant to one-eighth. In view of the offer of plaintiff, above referred to, we cannot do less than allow, for the working of the ground, the estimate of the plaintiff of the actual cost thereof. We take the estimate of plaintiff for the following reasons: We cannot take the estimate of the experts who testify in the case, because no two of them agree as to the cost of working this ground. We cannot average the estimates so made, because the defendant is not entitled to such compensation, for the reason that the whole work was done without authority of law, and against the protest of the majority interest; and we only give the defendant the $5,610 because the plaintiff has, in a spirit of fairness, in his complaint, tendered to defendant "the actual cost and expenses of the mining and extracting the gold," and, having proffered to give that which the law would scarcely compel him to give, and as the plaintiff proceeded with all possible speed to enjoin the defendant from working the ground, and, when the injunction was dissolved, proceeded to take his appeal with all expedition practicable, it is but justice to plaintiff to give his own estimate of such cost, and which seems, on the whole, to be equitable.

The district court finds, in finding of fact No. 4, "that the quantity of bedrock cleaned upon the 'Hatched Area' was about one-eighteenth of the total quantity of bedrock cleaned by the defendant; that the amount of gold contained in said 'Hatched Area,' and belonging exclusively to defendant, was $583.60." The defendant unquestionably had the right to work the "Hatched Area," as it is called, which was upon the Rosa claim, and which belonged to the defendant, in any manner it saw fit, and, if the product of such working had been kept separate from the product of the Niagara claim, the defendant would have been entitled to the whole of the gold taken therefrom; but it is mingled by defendant with that taken from the Nia-

gara claim. The area of bedrock cleaned off on the Rosa claim is uncertain, as appears by the finding of the court and the evidence. The court says about one-eighteenth of the whole area washed off. We have no means of knowing if this is correct. The gold taken therefrom cannot be identified. We have no means of knowing whether it was of the same value, ounce for ounce, as that taken from the Niagara. We have no means of knowing whether this ground was of equal or greater or less value than that washed from a like area of the Niagara. It was alongside of the Niagara, and adjoining it, but it does not follow that it was of equal value. It might have been of much greater or much less value. It is a remediless confusion of goods. "Confusion of goods arises where the goods of two or more persons are so intermingled that the several parts or portions can no longer be distinguished. Here the one who has caused the confusion loses his property for his pains." (3 Lawson's Rights, Remedies and Practice, sec. 1318.) Each owner is entitled to reclaim what had before belonged to him if the mixed articles are of equal value, or if the owner's can be distinguished and separated from the rest; but if the intermixture has so combined and blended the different portions that they can no longer be identified the property cannot be recovered. (*Smith v. Sanborn,* 6 Gray, 134; *Hesseltine v. Stockwell,* 30 Me. 237, 50 Am. Dec. 627; *Goff v. Brainerd,* 58 Vt. 468, 5 Atl. 393.) If the mixture is not distinguishable, nor an aliquot division possible, then the party who occasions, or through whose neglect or fraud occurs, the wrongful mixture, must bear the whole loss. (3 Lawson's Rights, Remedies and Practice, sec. 1318; *Robinson v. Holt,* 39 N. H. 557, 75 Am. Dec. 233.) Where the intermixture is the result of one's misconduct, he must bear the loss. He cannot recover for his own proportion, or for any part of the intermixture, but the entire property vests in him whose right is invaded. The latter may replevy the whole, or sue in damages for its value, and is not obliged to compensate the other at all. (3 Lawson's Rights, Remedies and Practice, sec. 1319, and cases there cited.) The area of ground washed off the Rosa claim is uncertain, and the amount of gold taken therefrom is wholly unknown; it is utterly indistinguishable from the rest. We can-

not indulge in guesswork, and we are therefore compelled to hold that the defendant cannot recover the portion taken from the Rosa claim, and so mingled with that taken from the Niagara as to leave it an unknown quantity. The judgment of the court below is reversed, and the cause remanded, with directions to the court to enter judgment in accordance with this opinion; with costs awarded to plaintiff.

Huston, C. J., and Sullivan, J., concur.